TEXAS COMPANY *v.* JONES.

Opinion delivered September 26, 1927.

1. MASTER AND SERVANT—SUFFICIENCY OF EVIDENCE.—In an action by an oil station employee against his employer for an injury on the theory that he was struck by a loose bolt flying from machinery, evidence *held* insufficient to support a verdict for plaintiff.

2. NEGLIGENCE—SUFFICIENCY OF EVIDENCE.—In an action for injury caused by defendant's negligence, plaintiff must show by a preponderance of the evidence some act of negligence on the part of the defendant causing his injury; and if the evidence is such that the negligence of the defendant may have caused the injury, but also tends equally to show that the injury resulted from some

cause other than the negligence of the defendant, this did not justify a verdict against the defendant.

3. MASTER AND SERVANT—SUFFICIENCY OF EVIDENCE OF NEGLIGENCE. —In an employee's action against his employer for negligent injury, plaintiff must present evidence of defendant's negligence causing the injury, and the mere fact that the plaintiff was injured while working for the defendant in the exercise of due care himself is not sufficient.

4. APPEAL AND ERROR—SUFFICIENCY OF EVIDENCE TO SUPPORT VERDICT. —Though a verdict supported by substantial evidence will not be disturbed on appeal, a verdict will not be permitted to stand when unsupported by substantial evidence.

Appeal from Nevada Circuit Court; *J. H. McCollum,* Judge; reversed.

*Wm. M. Hall, G. R. Haynie* and *Powell, Smead & Knox,* for appellant.

*Huey P. Long* and *William F. Denman,* for appellee.

MEHAFFY, J. The appellee, plaintiff below, brought suit in the Nevada Circuit Court against the appellant, defendant below. The plaintiff alleged that he was a citizen and resident of Cass County, Texas, and that the Texas Company was a corporation duly organized and existing under the laws of the State of Arkansas, and authorized to do business in Arkansas. That about the 8th day of July, 1924, and for some time prior thereto, the plaintiff was in the employ of the defendant company at or near Louann, in Ouachita County, Arkansas, engaged in assisting in the operation of a power pumping plant, and that, while so engaged, and while acting under the orders and directions of his foreman, and while in the exercise of due care for his own safety, he was seriously, painfully and permanently injured by, through and on account of the carelessness and negligence of the defendant, the Texas Company, its agents, servants and employees.

''That said injury occurred in this manner: that the plaintiff, while in the exercise of due care for his own safety, acting under the orders and directions of his foreman and other superiors, was doing and performing the duties of his labor and work for which he was

employed and to which he was assigned, and, in carrying out instructions from his superiors while working in the machine house or pumping station attached to an oil well of the said defendant, as aforesaid, by reason of defendant's negligence, carelessness and fault, a part of the appliances, machinery and apparatus struck petitioner, being a bolt or nut from the instrument known as and commonly called the 'idler,' or from the instrument called the 'clutch,' plaintiff being unable to be more definite, thereby immediately rendering petitioner unconscious for several days and thereafter disabling him from doing or performing any work or labor of any reasonable kind or character for the balance of his lifetime, and further physically and mentally deforming, deranging, impairing and paralyzing the petitioner through and in the manner as above set forth, and in the further particular manners to wit:

"Petitioner's skull was fractured, and a depression was also formed as a result thereof in the top of the skull, and, as a result of the same, the nervous system of petitioner's body, his muscular power and mental capacities were so weakened and impaired, deranged, disorganized and thrown out of coordination that petitioner became, as a result thereof, is now, and will ever be, an invalid and cripple, unable to do or perform any tasks or physical labor, partially paralyzed, so much so that he cannot do the tasks necessary to enjoy any ordinary conveniences or pleasures of any kind or character, and, since the said accident, at this time and ever hereafter, has constantly and will hereafter suffer such severe pain as great as he can overcome and survive; all the same because of and on account of the carelessness and negligence of the defendant, the Texas Company, its agents, servants and employees, and arising out of and in the course of his employment with the said defendant. That the defendant, the Texas Company, its agents, servants and employees, were careless, negligent and at fault, first, in failing, refusing and neglecting to furnish to the plaintiff a reasonably safe place in which he was required to

work; second, in failing, refusing and neglecting to keep its machinery and appliances in a reasonable safe condition; third, in failing, refusing and neglecting to keep in proper repair the 'idler' aforesaid, in that the nut or bolt was allowed to become loosened, worn and defected, improperly fastened and secured, thereby allowing and permitting same to become loosened and to be released and thrown out of order away from the said 'idler', striking and injuring the plaintiff as aforesaid; that the defendant, the Texas Company, its agents, servants and employees, knew, or, by the exercise of ordinary care could have known, of the unsafe and dangerous condition of said 'idler,' nut and bolt.   That, prior to the injury herein complained of, this plaintiff was a stout, able-bodied man, about thirty-three years of age, earning and capable of earning $150 per month, and bade fair, in the course of his work, to be rapidly promoted and to earn a wage of at least twice said amount, petitioner being, prior to his injury, an energetic and physically capable man; that now, as a result of the carelessness and negligence of the defendant, its agents, servants and employees, he is an invalid and cripple for life, as aforesaid, and has been greatly damaged in the sum of $60,000.''

The defendant answered, admitting that plaintiff was in the employ of defendant on the 8th day of July, 1924, and that he was injured on that day. It denied all the material allegations of the complaint, and alleged that the injury of the plaintiff was caused solely on account of his own negligence, and pleaded assumed risk.

The plaintiff, James R. Jones, testified that, on July 8, he was running the power station for the Texas Oil Company at Louann, Arkansas. Mr. Fussell was his foreman, and it was his duty to keep the machinery in repair. Fussell was gang-pusher for the Texas Oil Company; witness was making $142 or $142.50 a month; had been working for them about three months; had just gone on duty that morning about 12 o'clock, at which time he was to relieve the morning power man, who told

witness he had been having trouble with the plant, particularly the idler; it was running hot, and witness would have to watch it; witness had been watching it, oiling it every few minutes, trying to cool it off, because, when they would get hot, they would stick, or something would happen that would shut the station down; started around to oil it; had hung up gas ticket or gas checker, had come in the main wall, had gone to hang up his ticket, and started around to oil it up; that is the last thing witness recollects; had started towards this belt idler; something popped, like a gunshot in witness' ear; that was the only thing witness knew; witness was in the Warner Brown Hospital the next thing he remembers; does not know on what date he came to; was in the Warner Brown Hospital either 29 or 30 days; came to in the Warner Brown Hospital; was struck in the center of the head; showed up a three-quartered hole in witness' head, about a half inch; it was in witness' hat; corresponded with the place it made in witness' head; can feel the hole; seems to be as big as witness' thumb. Witness woke up in Warner Brown Hospital.

"Q. What size bolts were there in the idler? A. Well, they was something like an inch and a half long, I guess. Q. And about how big? A. Well, something like my little finger, or hardly as large. Q. How big was the hole in your hat? A. Well, it was about half an inch, or something like that. It was just a three-cornered hole in there, and it was just like my hat was, that way. Q. Was there a hole in your hat? A. Yes sir. Q. Was the hole in the hat bigger, smaller, or of the same size as the idler? A. Well, it was the same size."

There was no other mark on witness' head, except the three-cornered hole mentioned; it was a panama hat, soft straw.

Witness is handed drawing. When he got hurt he had reached a point along to the right of the air compressor (this point is indicated on drawing by figure 1) (also marked X); the idler pulley is referred to as the idler; had gone from the locker to the right of the air com-

pressor; heard something sounded like a gunshot; that was the last witness remembers; had started towards the idler because it was running hot; was trying to cool it off with oil; the drawing handed witness shows the situation there.

Witness had always been a pretty healthy, stout man before this accident; thinks he was thirty-three when he had this accident; will soon be thirty-six. Witness' weight is about fifteen or twenty pounds under what it was when the accident occurred. Has been able to do practically nothing since this injury; can't earn a living for his family; can't do any work; has not been able to work for anybody since he was hurt; is tired and worn out; no use of himself; weak; head worries him practically all the time; suffers pain in his head and back practically all the time; has had no ease since injured; doesn't feel natural; body is weak; has very little grip in his left hand; has some more in his right hand; feels paralyzed first on one side and then the other; more on left side at times; during these two years hasn't rested well at all; has been unable to do any work; tried working on the farm; could do but very little; had some little kids that worked and had a fellow hired who worked for witness this year. Farm consisted of about 58 acres; had a hired hand; is not able to do farm work; is having it done by others. Worries witness to have to undergo an examination; can hardly stand it; weakens him so; underwent an examination in Prescott yesterday for defendant's doctors; put him in bed; had to have a physician; put him in bed about five-thirty or six o'clock; was unusually pained after examination; stuck needles in witness; seemed they wanted to take their fingers and find every soft spot on witness' body; witness' legs cause an impediment in his walk; walks that way all the time since he got up from his bed; did not have this impediment before he was injured. Before the injury could talk good and strong; when the doctors stuck pins in him, could feel it sometimes and sometimes he couldn't. Is affected more on left side.

The bone was removed from witness' skull by Dr. Horton; thirty-three years of age; was earning $142.50; has not been able to do a man's work or even that of a ten-year-old boy since injury. Did not know at the time that idler or appliances were dangerous. Before the injury was considered by everybody a good, able-bodied man; had worked regularly. Scar very near the center of witness' head; suffered considerable pain over the examination the doctors made yesterday; reached Prescott Tuesday; came from El Dorado with Mr. Long in his car; came from Shreveport to El Dorado; had been examined by doctors at the hospital in Prescott; does not know the name of the doctor who examined him; did not get sick over that examination; doctor didn't try to insert his fingers in all of witness' joints; doctor was selected by plaintiff and his attorneys; defendant's doctors in their examination made witness sick; injury occurred on the 8th of July, 1924; was working at that time for the Texas Company at Louann as a power-house man; no one else worked in the power house; was his duty to keep machinery oiled; his duty to keep the floor clean; not necessarily his duty to watch the condition of the machinery; naturally one would see after it if he knew it was out of fix; had started to oil the idler when he was hurt; had worked in the power house a month or six weeks before he was hurt; began working there when the power house was first installed; was a new one; just been running about a month or six weeks; had been working there all that time; was to some extent familiar with the different pieces of machinery in the building; the machinery was all new to plaintiff; knew where all of it was located; knew how it ran; knew where it all was and how it operated; had worked in the oil field business for about eight or ten years before he was hurt; had never worked in a power house before; witness has not been able to go where he wanted to all the time since his injury; for the first eight or ten months practically stayed at home all the time. Tried to get a settlement out of the Texas Com-

pany, but they wouldn't settle; first filed suit in October, 1924.

"Q. I see. Now, you had a trial on that case at Texarkana, didn't you? A. Well, no, we didn't exactly have a trial. Q. Well, what did you have? A. **Well, I don't hardly know what you might call it. Mr. Long's brother-in-law had died—.**"

Had just been at work on the day that he was injured a few minutes—ten or fifteen minutes; had talked to the gas checker and had signed his gas report; had just went on; does not recollect having swept the floor; had probably dusted a little bit right around the back door; does not think he had picked up the broom that day before the accident occurred; testified in the trial of the case about this same injury in the Federal court at Texarkana; might have testified he had swept the floor some and had left his broom standing on the side of the door to the right; that is where they kept the broom. The drawing (general exhibit 1) shows pretty well the location of the different instruments and things and machinery in the power house; there are windows all around; all doors were open at the time plaintiff was hurt; don't suppose he did any sweeping when he came in that day; had just been there a few minutes; probably did sweep a little bit; belt comes over a good big wheel, which is much smaller than the power wheel; belt does not cross; there is a crank to tighten the belt; belt was fastened together with 14-inch belt clamp—3x14-inch. Probably the clamp wouldn't be as wide as the belt. Sometimes the clamps are built shorter. Witness was standing about ten or twelve feet from the idler at the time of the accident. Does not know whether the bolt came out of the butt of the idler. The air pressure tank was not shown on drawing.

Redirect examination.—The idler pulley must have gone around 250 or 300 revolutions a minute. Witness was coming over to oil up the idler and see about the oil circulating in the oil cup; was hit in the front of the head; there were bolts in the idler. The belt was on the back side of the idler; left is exposed in the direction of

where witness was standing. The bolt ran straight and then became twisted; when the belt got to the power wheel, it turned flat; power wheel was probably two feet off the floor; the center of the wheel was about eighteen inches or two feet from the floor; there are about eight or ten bolts in the belt, according to the width of the belt; a bolt goes through there probably every inch and a half; placed through the belt to hold the belt clamp together, and they frequently come out; idler turned around maybe 250 or 300 revolutions; traveled at a rapid rate of speed. Possibly 25 or 30 bolts in the idler, maybe more; there were no other bolts in any other appliances there that were shaped like the bolts in the idler.

Re-cross examination.—The bolts in the idler have a flat head, and it ran off to a sharp edge. They are square bolts. No other bolts in any other machinery just like it of which witness knows; not all the bolts have square heads and sharp points; some of them are round; there is other machinery with square-headed bolts; not sharp sides and points; square bolts would have sharp points, but not sharp sides and points; the bolt in the idler had a square, sharp head. It's flat on top; knew the kind of bolts in the idler before he was hurt; does not know of his own knowledge what hit him.

Does not know where the hat is; has seen it since he was hurt; saw it at Louann, about thirty days after he was hurt; it was at witness' house; the hole in the hat was between a half and three quarters of an inch; it was a small place there; is testifying from his idea by looking at it; never measured the bolts; his testimony on the size of them is from looking at them; the place in the hat was a snagged place like when one's pants are snagged from barb-wire or something. Lived at Louann some time after the injury. Had the hat at his house; does not know what became of it; it got out of the house and got away from there. The hole in the hat was a three-cornered hole, something like a half to three quarters of an inch; there was no other sharp-pointed bolt the size of this

bolt in the idler. The idler getting out of fix would shut down the machinery.

Re-cross examination.—If the idler would stop running, the whole power plant would shut down; the idler is a device that tightens the belt as well as holding it upon the power wheel, and its stopping would cause a heavy drag on the machinery and would kill it; never saw an idler out of fix; knows that it would stop it.

Redirect examination.—The idler getting out of fix will cause a constant drag on the engine, just cause it to pull so much heavier with the same amount of gas on it. If there was an increase of gas and advance the spark, probably the engine would run on, but having the same amount of gas and same amount of spark, when the idler began to drag it would kill it because it would be an added weight to it. Has seen idlers on steam engines drag.

Re-cross examination.—Does not know whether he went back to the power-house just a short time after he was hurt; that is something he knows nothing about.

D. T. Langston, a witness called by plaintiff, testified: Was working up in the Louann oil field on the 8th of July, 1924; knows Mr. Jones; witness was working for the Texas Company; witness and Jones were not working together; Mr. Jones was working for the Texas Company; witness was about 150 yards from where Mr. Jones was working on the 8th day of July, the day he got hurt; was working at the pumping station; saw Mr. Jones that day; Mr. Jones came over to the station where witness was at work about twelve or a little after; does not remember the exact hour of the day; he was kinder unconscious; didn't know what he was doing when he got over there; had a hole in the top of his hat; examined and found he had a hole in his head underneath the hat; it was kind of a three-cornered hole; the power was shut off when Jones came to where witness was working; shut off just before he got there; could hear the power running; made lots of racket; could hear it from the station; Jones staggered up where witness was;

about the time he staggered up there witness noticed the power was off.

Cross-examination.—No kin to Mr. Jones; has never testified in this case before; never been identified with it until today; is not working down there; is farming at Atlanta, Texas; lives about ten or twelve miles from Jones; has known him five or six years; does not know how Jones found out what he knows about the accident; has not talked to Jones about it recently; has not talked to any one about it; hasn't even told anybody about it; lives in Texas ten or twelve miles from Jones; the hole in plaintiff's head was something like a half or an inch long; was under his hair; bathed his head with water when he came over there; witness was inside of the pumping station when Jones came in the door; had just come from the back of the station up to the front; he came in the door of the pumping station; noticed the power-house stop running, and looked out and saw Jones coming over that way; did not just exactly hear it when it stopped; noticed it was down, and looked out that way; worked all afternoon there in the pumping station; worked there for the company until the 15th day of December, 1924; the power-house was down something like an hour or an hour and a half; don't remember whether he heard it when it started up again; does not know who started it; knows he heard it stop, and late in the afternoon it was running.

Redirect examination.—First saw Mr. Long Sunday afternoon; first time he had ever seen Mr. Long about the case. Was paid for that day's work.

Re-cross examination.—Talked to Mr. Long Sunday evening when they came by.

Redirect examination.—Had never known Mr. Long before that Sunday evening.

It is unnecessary to set out the instructions. The instructions given by the court, when considered together, correctly state the law.

A number of other witnesses testified, but none of them claimed to know anything about how the injury occurred, and, since a majority of the court has reached

the conclusion that the evidence is not legally sufficient to support the verdict, it becomes unnecessary to set out the testimony of witnesses as to the extent of the injury.

A careful consideration of all the evidence has convinced a majority of the judges that the evidence is insufficient to support the verdict. While it is true that, if there is any legal evidence to support the verdict of a jury, the court will not disturb it, yet this court has repeatedly held that circumstances of mere suspicion or where the evidence tends equally to sustain either of two inconsistent propositions, a verdict in favor of the party bound to maintain one of them against the other is necessarily wrong. In other words, the plaintiff must show by a preponderance of the evidence some act of negligence on the part of the defendant causing his injury. And if the evidence is such that the negligence of the defendant may have caused his injury, but that it also tends equally to show that the injury resulted from some cause other than the negligence of the defendant, this would not justify a verdict against the defendant.

The mere fact that the plaintiff was injured while working for the defendant and while in the exercise of due care himself is not sufficient to justify a verdict against the defendant. There must be some evidence of the negligence of the defendant and that that negligence caused the injury.

The plaintiff relies on his own testimony, and he says that they had been having trouble with the "idler," that it was running hot on him, and that it would stick or something would happen to shut down the station. That he went around to oil it up, and, after starting around to oil it up, he can remember nothing else.

The allegation in the complaint is that a bolt flew out from the idler and hit him, but there is no testimony tending to support this allegation. Counsel asked plaintiff this question:

"Q. Were you hit by something or did you hear something pop?" And he answered: "Nothing, only

something popped just like a gunshot in my ear. That was the only thing I ever knew."

It is wholly immaterial whether the idler was hot or not and whether the machinery was defective or not, unless these things, or some of them, caused the injury. It is possible that a bolt may have hit him. It is also possible that he might have been hit by something else or injured in some other way. There is certainly no evidence by plaintiff or any other witness tending to show that a bolt flew out and hit him.

"It is thoroughly well settled that verdicts of juries must have a more substantial basis than mere conjecture or speculation on which to rest." *St. L. I. M. & S. R. Co.* v. *Smith,* 117 Ark. 655, 174 S. W. 547.

"It is a well established doctrine, often recognized by this court, that juries will not be permitted to rest a verdict purely on speculation. That there must be testimony which warrants a finding of the essential facts or which would warrant a reasonable inference of the existence of those facts upon which liability is predicated before a verdict will be permitted to stand." *St. L. I. M. & S. R. Co.* v. *Belcher,* 117 Ark. 638, 175 S. W. 418; *St. L. I. M. & S. R. Co.* v. *Enlow,* 115 Ark. 584, 171 S. W. 912; *Midland Valley Ry. Co.* v. *Ennis,* 109 Ark. 206, 159 S. W. 214.

There are many other cases which have been decided by this court to the same effect, and, while it is a well-settled rule of this court that, if there is any substantial evidence to support the verdict it will not be disturbed, yet it is equally well settled by the decisions of this court that a verdict cannot be permitted to stand unless there is some substantial evidence to support the verdict. And, as we have already said, after a careful consideration of all the evidence in this case, the conclusion has been reached that there is no evidence that the plaintiff was injured by reason of any negligence on the part of the defendant. If the bolt flew out and hit the plaintiff because of the negligence of the defendant, this would entitle him to recover, but he does not claim that this

occurred. In fact, he does not claim to know what hit him. That a bolt hit him is mere conjecture.

Since the evidence is insufficient to support the verdict, this cause is reversed, and remanded for a new trial.